UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAKOTA GIRLS, LLC, *et al.*,**

      **Plaintiffs,** :

v.

**PHILADELPHIA INDEMNITY
INSURANCE CO.,** :

      **Defendant.**

**Case No. 2:20-cv-2035
Judge Sarah D. Morrison
Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This case was filed by owner-operators of private preschools against their insurer over a dispute regarding insurance coverage for losses stemming from the COVID-19 global pandemic. As a result of the pandemic, Plaintiffs' operations were shut down and/or suspended following orders, issued by the State of Ohio, aimed at limiting the spread of the virus. One or more of those orders interrupted Plaintiffs' businesses and prohibited access to and operation of their business premises. The Second Amended Complaint ("SAC") alleges that Defendant Philadelphia Indemnity Insurance Co. ("PIIC") improperly denied coverage for lost business income, extra expense, and interruption by civil authority caused by those orders. (SAC, ECF No. 22.)

Currently pending before the Court are three motions. First, is PIIC's Motion to Dismiss the SAC. (Mot. to Dismiss, ECF No. 24.) Plaintiffs responded to that Motion (Resp. in Opp'n, ECF No. 32) and PIIC filed a reply (Reply, ECF No. 36). An

*amicus curiae* brief was filed by United Policyholders on the issues raised in the Motion to Dismiss. (ECF No. 30-1.) Second is PIIC's Motion to Sever. (ECF No. 25.) Plaintiffs also oppose this Motion (ECF No. 27) and PIIC filed a reply (ECF No. 28). The third motion is the Motion of American Property Casualty Insurance Association ("APCIA") and National Association of Mutual Insurance Companies ("NAMIC") for Leave to File *Amicus Curiae* Brief. (ECF No. 67.) Plaintiffs oppose this motion (ECF No. 69) and the proposed *amici* replied. (ECF No. 70.)

All three motions are ripe for consideration. For the reasons that follow, PIIC's Motion to Dismiss is **GRANTED**. PIIC's Motion to Sever is, accordingly, **DENIED AS MOOT**. Finally, APCIA and NAMIC's Motion for Leave to File Amicus Curiae Brief is **DENIED**.

## I.  BACKGROUND

The following summary is drawn from the factual allegations in the SAC. On a Motion to Dismiss, all such factual allegations are taken as true.

### A.  The Policies

Plaintiffs own and operate private preschools in Ohio. (SAC, ¶ 1.) Each Plaintiff purchased commercial insurance policies[1] from PIIC ("the Policies"), which Policies were in place during the relevant time periods. (*Id.*, ¶¶ 1, 6–7.)

---

[1] The Court may properly consider the Policies without converting the instant motion to one for summary judgment. *See Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (citation omitted) (a court may consider matters outside the complaint when ruling on a motion to dismiss "when the document outside the complaint is referred to or attached to the pleadings and is integral to plaintiff's claims").

The Policies are "all-risk policies" that "covered all risks of loss except for risks that are expressly and specifically excluded." (*Id.*, ¶ 8.) The Policy provisions relevant to this action are as follows:

- <u>Building and Personal Property Coverage</u>. Covers "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."[2] (*Id.*, ¶ 10.)

- <u>Business Income Coverage</u>. Covers actual lost Business Income sustained due to the necessary "'suspension' of [their] 'operations' during the 'period of restoration' caused by direct physical loss of or damage to" the property described in the Policies. (*Id.*, ¶ 15.)

- <u>Civil Authority Coverage</u>. Triggered by damage to property other than property at the premises described in the Policies, covers "actual loss of Business Income [Plaintiffs] sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply: (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property." (*Id.*, ¶ 21.)

- <u>Communicable Disease Coverage</u>. Covers "actual loss of 'business income' you sustain and necessary 'extra expense' you incur during a 'period of restoration' as a result of having your entire 'operations' temporarily shut down or suspended. The shutdown or 'suspension' must be ordered by a local, state or federal Board of Health having jurisdiction over your 'operations.' Such shutdown must be due directly to an outbreak of a 'communicable disease' or a 'water-borne pathogen' that causes an actual illness at the insured premises described in the Declarations. An actual business shutdown must occur." (*Id.*, ¶ 25.)

---

[2] Any terms defined in the Policies (such as capitalized terms or terms set off by quotation marks) will take on the definitions given in the Policy. The Court will only recite the definitions herein to the extent necessary.

3

The Building and Personal Property Coverage and the Business Income Coverage both generally provide that, when an insured experiences a "direct physical loss of or damage" to covered property, the loss is covered. (ECF No. 24-1,[3] PAGEID # 5477, 5493.) Likewise, the Civil Authority Coverage kicks in when a civil authority bars access to covered property in response to "direct physical loss or damage to other property." (ECF No. 24-20, 7.) The Policies do not define the term "direct physical loss of or damage to," nor do they explain the distinction between "physical loss" and "damage." (SAC, ¶ 11.) Plaintiffs also have Communicable Disease Coverage. (SAC, ¶ 24. *See also* ECF No. 24-21.) That coverage does not require physical loss or damage, but will cover losses incurred during a Period of Restoration when a local, state, or federal Board of Health shuts down or suspends operations due to an outbreak of a communicable disease that causes an actual illness at the insured premises. (ECF 24-21.)

Plaintiffs assert that their losses caused by the COVID-19 pandemic are covered losses under the Policies. To that end, Plaintiffs allege that they have each submitted or attempted to submit a claim with PIIC, but PIIC has either refused to pay the claims or failed to adequately investigate the claims. (SAC, ¶¶ 36, 60-64.)

### B.  COVID-19 shutdown of Plaintiffs' operations

As a result of the COVID-19 pandemic, Plaintiffs' operations were shut down as of 11:59 p.m. on March 25, 2020. (*Id.*, ¶¶ 28, 34, 49.) This shutdown was a result

---

[3] Citations to the Policies herein are to the policy held by Dakota Girls, LLC (ECF No. 24-1). All of the Plaintiffs policies contain the same operative language other than the Virus Exclusion, which is discussed *infra*.

of two orders from the State of Ohio (the "Closure Orders"). First, on March 22, 2020, Governor Mike DeWine ordered that "all day care programs must close by 11:59 p.m. on Wednesday, March 25, 2020." (*Id.*. ¶ 46.) On March 24, then-Director of the Ohio Department of Health, Amy Acton, MD, MPH, signed a Director's Order to "Close Facilities Providing Child Care Services," stating that facilities providing child care services were being closed "to avoid an imminent threat with a high probability of widespread exposure to COVID-19 with a significant risk of substantial harm to a large number of people in the general population." (*Id.*, ¶ 47.) Childcare providers were permitted to re-open in May of 2020, with reduced staff-to-child ratios and other restrictions. (Id., ¶ 51.)

Each Plaintiff alleges that there had been individuals on their premises with symptoms consistent with COVID-19, including, but not limited to, fever or chills, cough, shortness of breath, fatigue, muscle or body aches, sore throat, congestion, or runny nose, or who potentially had contact with someone diagnosed with COVID-19. (*Id.*, ¶ 29.) However, due to the unavailability of widespread testing, in combination with the fact that children under age 2 were not being tested, Plaintiffs represent that it was impossible or impractical to receive a positive COVID-19 confirmation for those individuals. (*Id.*, ¶ 29.)

Because of the closures and the nature and extent of the COVID-19 disease, Plaintiffs' facilities were rendered uninhabitable and unusable for periods of time in 2020. (*Id.*, ¶ 54.)

  **C.**  **Procedural Background**

The original Complaint was filed in this matter by Dakota Girls, LLC dba

The Goddard School of Grove City and Elliott Care, LLC dba The Goddard School of Worthington on April 22, 2020. (ECF No. 1.) A First Amended Complaint was filed to add 13 more plaintiffs, each a preschool with substantively similar allegations. (ECF No. 8). The currently operative pleading is the SAC, which joined two more plaintiffs and certain additional allegations. (ECF No. 20.) The SAC seeks a declaratory judgment and asserts claims for bad faith and breach of contract. (*See generally*, SAC.) PIIC's Motion to Dismiss and Motion to Sever were filed in response to the SAC.

## II.  SUBJECT MATTER JURISDICTION

Plaintiffs assert that this Court has jurisdiction over their claims under 28 U.S.C. § 1332. (SAC, ¶ 3.) Because the SAC did not include sufficient information to determine whether complete diversity existed among the parties, the Court ordered Plaintiffs to file a notice supplementing its jurisdictional allegations. (ECF No. 48.) In response, Plaintiffs provided sufficient information for the Court to establish that complete diversity of citizenship in fact exists among the parties. (ECF No. 66.) This Court has jurisdiction over the claims.

## III.  MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

The APCIA and the NAMIC moved for leave to file *Amicus Curiae* brief on February 5, 2021— more than six months after PIIC filed its Motion to Dismiss and more than five months after PIIC filed its Reply. (ECF No. 67.) As this Court recently stated, one of the factors relevant to the determination of *amicus* status is whether the proffered information is timely. (*See* ECF No. 49, 2 (citing *U.S. v. City of Columbus*, No. 2:99-CV-1097, 2000 WL 1745293, at *1 (S.D. Ohio Nov. 20, 2000)

6

(Holschuh, J.).) Yet, APCIA and NAMIC moved to file an *amicus* brief long after the Motion to Dismiss was filed and after the Court ordered that "[n]o further briefing will be allowed." (*Id.*, 3.) If the issues raised in PIIC's Motion to Dismiss were of such great importance to the proposed *amici*, they should have sought leave to file their brief simultaneous with (or at least close in time to) the briefing that mattered to them. For example, and in contrast to their conduct, *amicus* United Policyholders sought leave to file its brief promptly after PIIC's Motion to Dismiss was filed. Additional briefing at the eleventh hour will unduly delay the Court's ruling on PIIC's Motion to Dismiss and Motion to Sever. The Motion for Leave to File Amicus Curiae Brief is **DENIED**.

### IV. MOTION TO DISMISS

PIIC now moves to dismiss Plaintiffs' breach of contract and bad faith claims, as set out in the SAC. However, the SAC does not plausibly allege any "direct physical loss or damage" caused by COVID-19, as is required to trigger application of the Building Personal Property Coverage, Business Income Coverage, or Civil Authority Coverage. Nor does it plausibly allege that the Communicable Disease Coverage properly applies. Because the breach of contract claim fails, so too must the bad faith claim.

#### A. Standard of Review

Federal Rule of Civil Procedure 12 authorizes dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To meet this standard, the complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

7

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the non-moving party, accepting as true all of plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Nonetheless, the Court must read Rule 12 in conjunction with Federal Rule of Civil Procedure 8(a), which requires a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 907 (S.D. Ohio 2013) (Smith, J.). Thus, the pleading's factual allegations, assumed to be true, must do more than create mere speculation or suspicion of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). *See also* Fed. R. Civ. P. 8(a)(2). Further, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. As such, while a plaintiff is not required to set forth detailed factual allegations at the pleading stage, the complaint must contain a basis upon which relief can be granted; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Id.* at 679.

  **B. Declaratory Judgment and Breach of Contract Claims**

The Court begins with a review of the rules of insurance policy

interpretation. Under Ohio law,[4] insurance contracts are construed like any other written contract. *Scott v. Allstate Indem. Co.*, 417 F. Supp. 2d 929, 932 (N.D. Ohio 2006). "The court's role in interpreting a contract is to give effect to the intent of the parties." *Fujitec Am., Inc. v. AXIS Surplus Ins. Co.*, 458 F. Supp. 3d 736, 743 (S.D. Ohio 2020) (Litkovitz, M.J.) (quotation omitted). To give such effect, "[c]ontract terms are generally to be given their ordinary meaning when the terms are clear on their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *CoMa Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (citations omitted). *See also Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). "An insurance contract will only require interpretation if the applicable language is ambiguous—that is, open to more than one interpretation." *Scott*, 417 F.Supp.2d at 932. When an insurance contract contains ambiguous language, such language must be "construed strictly against the insurer and liberally in favor of the insured." *Id.* However, "liberal construction cannot be used to create an ambiguity where one does not exist." *Id.* "If the terms of a policy are clear and unambiguous, a court must enforce the contract as written, giving words used in the contract their plain and ordinary meaning." *Id.* at 933. It follows then, that "where an exclusionary clause in an insurance contract is unambiguous, Ohio law requires that the plain language of

---

[4] "When an insurance contract predicated upon diversity jurisdiction is before [the] Court, the substantive law of the forum state, the state in which the lawsuit was filed, must be applied." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Paterson*, 417 F. Supp. 3d 888, 893 (N.D. Ohio 2019) (citation omitted).

9

the clause be given effect." *Id.*

The Court will analyze the Building Personal Property and Business Income Coverages, the Civil Authority Coverage, and the Communicable Disease Coverage in accordance with these principles, and in turn.

### 1. Building Personal Property and Business Income Coverages

PIIC first argues that Plaintiffs failed to plead sufficient facts to bring their claims under the Policies' Building Personal Property and Business Income Coverages. (Mot. to Dismiss, 10–12.) Specifically, PIIC argues that those Coverages require a "direct physical loss of or damage to" covered property, yet Plaintiffs fail to plead facts describing any physical change, alteration, or damage to any covered property. Plaintiffs do not dispute that the Policies require "direct physical loss or damage" to property. Rather, Plaintiffs argue that PIIC's definition of that term is unduly restrictive because, under the Policies, "direct physical loss" can reasonably be interpreted to include the loss *of use* of the property. (Resp. in Opp'n, 13–14.) It is Plaintiffs' position that they have plausibly alleged a claim when this broader definition is employed.

Plaintiffs are not the first litigants to adopt this argument. Our sister Court in the Northern District[5] has considered the precise question here at issue—

---

[5] In *Neuro-Communication Services, Inc. v. The Cincinnati Ins. Co.*, the Court certified two questions to the Ohio Supreme Court:

> Does the general presence in the community, or on surfaces at a premises, of the novel coronavirus known as SARS-CoV-2, constitute direct physical loss or damage to property; or does the presence on a premises of a person infected with COVID-19 constitute direct physical loss or damage to property at that premises?

10

whether loss of use resulting from COVID-19 business shutdowns constitutes "direct physical loss of or damage" to property—on several recent occasions. *See, e.g., Santo's Italian Café LLC v. Acuity Ins. Co.*, __ F. Supp. 3d __, 2020 WL 7490095 (N.D. Ohio Dec. 21, 2020) (Barker, J.); *Family Tacos, LLC v. Auto Owners Ins. Co.*, __ F. Supp. 3d __, 2021 WL 615307 (N.D. Ohio Feb. 17, 2021) (Calabrese, J.). *See also Brunswick Panini's, LLC v. Zurich Am. Ins. Co.*, No. 1:20-CV-1895, 2021 WL 663675 (N.D. Ohio Feb. 19, 2021) (Boyko, J.). *But see Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*, No. 1:20-CV-1239, 2021 WL 168422 (N.D. Ohio Jan. 19, 2021) (Polster, J.) (concluding that the phrase "direct physical loss of or damage to property" is ambiguous). This Court finds the analysis by Judges Barker and Calabrese persuasive here.

It is true, the Policies do not define "direct physical loss or damage." However, the fact that the Policies do not define the terms does not make them ambiguous. *Penton Media, Inc. v. Affiliated FM Ins. Co.*, No. 1:03-CV-2111, 2005 WL 8171363, at *6 (N.D. Ohio Sept. 30, 2005) (citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999)). Rather, the Court will give common words "their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of

---

No. 4:20-CV-1275, 2021 WL 274318, at *1 (N.D. Ohio Jan. 19, 2021). Plaintiffs submitted argument to the Ohio Supreme Court opposing acceptance of the certified questions, in part because "[w]ell-established Ohio precedent already directs the U.S. District Court how to interpret the particular commercial liability insurance policy at issue . . . ." Prelim. Mem. of *Amici Curiae* Interested Businesses Throughout Ohio Opposing Acceptance of Certified Questions filed Feb 18, 2021, in *Neuro-Communications Services, Inc. v. The Cincinnati Ins. Co.*, Ohio Supreme Court Case No. 2021-0130. This Court agrees with Plaintiffs: the law in this area is well-established. Accordingly, this Court need not delay its decision.

11

the instruments." *Foster Wheeler Enviresponse*, 678 N.E.2d at 526 (quotation omitted). Looking at the ordinary meaning of the operative words, in view of the context, "physical" means "having material existence: perceptible especially through the senses and subject to the laws of nature." *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/physical (last visited March 5, 2021). In turn, "loss" means "destruction, ruin" or "the act of losing possession: deprivation." *Id.*, https://www.merriam-webster.com/dictionary/loss (last visited March 5, 2021). And, finally, "damage" means "loss or harm resulting from injury to person, property, or reputation." *Id.*, https://www.merriam-webster.com/dictionary/damage (last visited March 5, 2021). As Judge Calabrese reasoned in *Family Tacos*:

> [t]aking these words together according to their ordinary meanings, "physical loss of" property means material, perceptible destruction or deprivation of possession. "Physical damage to" property means material, perceptible harm. In other words, the phrase intends a tangible loss of or harm to the insured property, in whole or in part. As the trigger for coverage, this policy language excludes financial or monetary losses resulting from the novel coronavirus, SARS-CoV-2, which occasioned this dispute for the simple reason that the virus did not work any perceptible harm to the properties at issue, even if (construing the allegations in Plaintiff's favor) the virus may be found on surfaces there.

2021 WL 615307, at *5. Accordingly, the Policies require more than a simple "loss of use" of the property. For coverage under the Policies, there must be a material or perceptible destruction, harm, or ruin to covered property.

Plaintiffs' proposed interpretation of the language at issue is simply not supported by the ordinary meaning of that language, or Ohio courts' past

12

interpretation of it. *See Santo's Italian Café*, 2020 WL 7490095 at *8 (citing *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1143 (Ohio Ct. App. 2008)); *Family Tacos*, 2021 WL 615307 at *6–8 (discussing Ohio case law interpreting "physical loss of or damage to" property). Namely,

> [t]he requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Mastellone*, 884 N.E.2d at 1143 (quoting 10A COUCH ON INSURANCE (3d Ed. 1998), § 148:46).

Reading the term "physical loss" to mean material or perceptible destruction, harm, or ruin is also consistent with other provisions of the Policies. *See Russcher v. Outdoor Underwriters, Inc.*, 821 F. App'x 509, 514 (6th Cir. 2020) ("Courts review insurance policy terms in the context of the whole policy so as to read the terms in harmony."). For example, when there is coverage for Business Income and Extra Expense, the Policies contemplate that such coverage will occur only during the Period of Restoration. *See, e.g.,* ECF No. 24-1, PAGEID # 5493 ("We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'."). The Period of Restoration is defined as the period of time that begins after direct physical loss or damage and ends "on the earlier of (1) The date when the property at the described premises should be repaired, rebuilt or replaced . . . ; or (2) The date when business is resumed at a new permanent location." (*Id,* , PAGEID # 5501.) To interpret the Policies as requiring

13

anything other than that the covered premises be destroyed, ruined, or otherwise materially or perceptibly altered would make the Period of Restoration definition nonsensical.

In the SAC, Plaintiffs generically allege that they have experienced "direct physical loss of or damage to Plaintiffs' Covered Properties and business operations." (SAC, ¶¶ 54, 56.) However, these allegations are conclusory statements mimicking the requirements of the Policies. Plaintiffs have not alleged any facts that, if proven to be true, would establish that their property was destroyed, ruined, or otherwise materially or perceptibly altered. Rather, the allegations make clear that, at all times, Plaintiffs remained in possession of the insured premises and those premises remained in their ordinary condition; it was only that the ways in which they could operate on those premises was limited. Accordingly, Plaintiffs have failed to allege facts sufficient to bring them under the Policies' Building Personal Property Coverage or Business Income Coverage.

### 2. Civil Authority Coverage

Plaintiffs also allege that the Policies require coverage of their losses under the Civil Authority Coverage, which is separate from and in addition to the other coverages under the Policies. The Civil Authority Coverage provides coverage when a civil authority prohibits access to the insured's premises due to "direct physical loss of or damage to" property *other than* the insured's premises. PIIC argues that Plaintiffs failed to plausibly allege that the Closure Orders were directly in response to any physical loss or damage to another property, which is a necessary condition for such coverage.

14

Because the Civil Authority Coverage also depends on the meaning of the "direct physical loss of or damage to" property, the above analysis applies here as well. Under the plain and ordinary meaning of the Policies' language, "direct physical loss or damage" is not implicated by COVID-19 conditions that occurred without material or perceptible destruction or alteration of property. Plaintiffs have not alleged that the Closure Orders were issued in response to any actual physical loss or damage to the property of others; they allege only that the Closure Orders were issued "in response to dangerous physical conditions." (SAC, ¶ 34).

The language of the Closure Orders does not rescue Plaintiffs' claims. While Plaintiffs cite to the fact that a subsequent Ohio Department of Health Order recognized COVID-19's "propensity to physically impact surfaces and personal property" (Resp. in Opp'n, 26), that undisputed propensity is not a substitute for factual allegations of direct physical loss of property. Not a one of the Closure Orders provides that it was issued "due to any direct loss of or damage to property." Plaintiffs have therefore not alleged facts sufficient to invoke the Civil Authority Coverage of the Policy.

### 3. Communicable Disease Coverage

Finally, PIIC argues that Plaintiffs failed to allege that there was an actual outbreak or illness at any of the insured premises as is necessary for coverage under the Policies' Communicable Disease Coverage. Unlike the coverages previously discussed, PIIC's Communicable Disease Coverage does not require direct physical loss or damage to property. Rather, by its terms, this coverage protects against

losses of business income resulting from the outbreak of a communicable disease. Specifically, it covers losses caused

> as a result of having your entire "operations" temporarily shut down or suspended. The shutdown or "suspension" must be ordered by a local, state or federal Board of Health having jurisdiction over your "operations." Such shutdown must be due directly to an outbreak of a "communicable disease" or a "waterborne pathogen" that causes an actual illness at the insured premises . . . . An actual business shutdown must occur.

(Doc. 24-21, PAGEID # 10009.)

PIIC does not dispute that COVID-19 is a "communicable disease" or that there was an order from a local or state Board of Health with jurisdiction over the Plaintiffs that shut down or suspended their operations. The dispute is whether the Policies require that the shutdown must be due to an "outbreak of a 'communicable disease' . . . that causes an actual illness at the insured premises." PIIC argues that they do.

Plaintiffs argue that, applying the last antecedent rule, the Policies provide coverage if the shutdown was due to *either* "an outbreak of a communicable disease" *or* "a waterborne pathogen that causes actual illness at the insured premises." (Resp. in Opp'n, 29–30.) In other words, they argue that the language "that causes actual illness at the insured premises" describes "waterborne pathogen" and not "communicable disease."

The Ohio Supreme Court has held that the last antecedent rule cannot be used to contravene the intent of an insurance policy "if there is contrary evidence that demonstrates that a qualifying phrase was intended to apply to more than the

16

term immediately preceding it[.]" *Wohl v. Swinney*, 888 N.E.2d 1062, 1065 (Ohio 2008). Accordingly, the Court must examine the contract as a whole to determine whether any contrary intent appears. *Id.* (citing *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003) ("When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement. We examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy.")).

When read as a whole, it becomes clear that the Communicable Disease Coverage endorsement covers those losses arising from a communicable disease outbreak *at* the insured premises – *not* for an outbreak occurring elsewhere. The endorsement specifies covered expenses including those for cleaning equipment and disinfecting the insured premises (*see* ECF 24-21, PAGEID # 10009), work that would not be necessary unless there were an outbreak at the insured premises. The endorsement also contemplates coverage for "extra expenses" incurred to minimize the suspension of business if operations cannot continue (*see id.*, PAGEID # 10010), also steps that also would be irrelevant if the suspension of business was due to an outbreak of illness in the general population. Similarly, benefits are payable under the Communicable Disease Coverage for expenses incurred during a Period of Restoration. The Period of Restoration begins when the insured's operations are closed and its "premises are evacuated due to illness caused by an outbreak of a 'communicable disease . . ." (*Id.*, PAGEID # 10011.) There would be no Period of Restoration, as that term is defined in the endorsement, unless there was an actual

17

illness at the insured premises. These provisions contemplate an outbreak of communicable disease on the insured's premises, not an outbreak affecting the public at large.

Accordingly, if interpreted as Plaintiffs propose, the last antecedent rule would render other provisions of the Communicable Disease Coverage meaningless. The rule therefore does not apply. The Policies can only be read to require that any shutdown must be due to an outbreak of a communicable disease causing an actual illness at the insured premises.

Nowhere in the SAC do Plaintiffs allege that COVID-19 was actually present in or on its premises, or that anyone on premises was actually infected with COVID-19. Instead, Plaintiffs allege that individuals on their premises exhibited symptoms "consistent with COVID-19" but that such individuals were not tested for the disease. (SAC, ¶¶ 29, 30.) Even construing these allegations in the light most favorable to Plaintiffs, they fall short of a plausible allegation that there was "an actual [COVID-19] illness at the insured premises." There are no factual allegations that raise a right to relief above the speculative level. Accordingly, Plaintiffs have failed to allege facts sufficient to bring them under the Policies' Communicable Disease Coverage.

### 4. Virus Exclusion

According to PIIC, seven of the Plaintiffs' Policies were subject to a Virus Exclusion. (Mot. to Dismiss, p. 7.) However, because the SAC fails to plausibly allege that benefits are otherwise payable under the Policies, there is no need for the Court to analyze whether an exclusion applies.

### C. Bad Faith Claim

PIIC also moves to dismiss Plaintiffs' bad faith claim. "To successfully assert a bad-faith claim, the insured must show that the insurer failed to exercise good faith in processing a claim by refusing to pay or to defend the claim, when not based upon circumstances that furnish reasonable justification therefor." *Wright State Physicians, Inc. v. Doctors Co.*, 78 N.E.3d 284, 290 (Ohio Ct. App. 2016) (internal quotations and citations omitted). Because Plaintiffs have failed to state a claim for breach of contract, their bad faith claim necessarily fails as well. *See Gehrisch v. Chubb Grp. of Ins. Cos.*, 645 F. App'x. 488, 494 (6th Cir. 2016) (noting that, if an insured's breach of contract claim fails, so does his bad faith claim).

## V. CONCLUSION

While there is no doubt that COVID-19 and the Closure Orders have had a devastating impact on many businesses, Plaintiffs cannot plausibly allege that this impact is covered under the Policies as written.

For the reasons set forth above, APCIA and NAMIC's Motion for Leave to File *Amicus Curiae* Brief (ECF No. 67) is **DENIED**. PIIC's Motion to Dismiss the SAC is **GRANTED**. PIIC's Motion to Sever is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**